Hough, J.
It is urged in the amended petition, and admitted in the answer, that the defendant is a partnership association. A partnership association is a creature of statute, being provided for under Part Second, Title VII, Division I, Chapter 1, General Code, and the purpose for which it may be formed, as provided in Section 8059, General Code, is for “conducting any lawful business or occupation within the United States.”
And Section 8070, General Code, provides that “The association from time to time may divide profits.”
The whole tenor of the act seems to provide for the organization and conduct of business for profit. We very much doubt, whatever may be its legal aspect, that the defendant is a partnership association.
■ Defendant says (record, page 24) that it has accepted the ordinance, which in Section 1 gave permission to use the streets, alleys and public ways, to supply the citizens and the public with telephone communication, for the purpose of erecting a mutual telephone plant, and operating it.
. Section 614-2, General Code, which is a part of the public utilities act, provides in part as follows:
“Any person or persons, firm or firms, co-partnership or voluntary association, joint stock association, company or corporation, wherever organized or incorporated: * * * When engaged in the business of transmitting to, from, through, or in *492 this state, telephonic messages, is a telephone company and as such is declared to be a common carrier.”
Whatever genus of association or sort of grouping of interest this defendant may be, in whatever legal entity it may be classed, the above recitation is broad enough to include it, and when it is concerned in the erection and operation of a telephone plant "it seems clear beyond peradventure that it expects to engage in the business of transmitting to, from, through, or in this state, however extended, or however limited, telephonic messages.
Then this concern, whatever may be its species, is a telephone company, and, being a telephone company, it is also a common carrier, so declared to be by the legislature.
What is a common carrier ? “A common carrier is one that undertakes for hire or reward to carry, or cause to be carried, goods for all persons indifferently who may choose to employ him, from one place to another.” United States Express Co. v. Backman, 28 Ohio St., 144.
The term “common carrier,” applied to telephone companies, would then be defined to be one who undertakes, for hire or reward, to carry, or furnish the medium for carrying, messages, news, or information, for all persons indifferently, who may choose to employ it, or use such medium, from one place to another.
The telephone company then must serve, without discrimination, all who desire to be served and who conform to the reasonable rules of the company.
*493 Section 614-2a provides that "The term ‘public utility’ as used in this act, shall mean and include every corporation, company, co-partnership, person or association, their lessees, trustees or receivers, defined in the next preceding section, except such public utilities as operate their utilities not for profit, and except such public utilities as are, or may hereafter be owned or operated by any municipality, and except such utilities as are defined as ‘railroads’ in sections 501 and 502 of the General Code * * *
It is apparent that the defendant is a public utility, a servant of the public, and being a public utility, it must necessarily hold itself out to serve impartially the citizens generally of the territory occupied by it. It is this very public obligation that permits it to be the recipient of a grant or franchise from the village, and would permit it to receive the same character of grant in the public highways; but counsel for the defendant say that it might exercise that right without a franchise, under Sections 9170 and 9180, General Code, which are made applicable to telephone companies by Section 9191, General Code.
It is true that this power came from the state, but with the passage of Section 9182, General Code (62 O. L., 72, and 77 O. L., 264), which refers to the same subject-matter as do Sections 9170 and 9180, supra, and is a part of the same act, the first mentioned sections apply only to public utilities. In State, ex rel. Am. Union Telegraph Co., v. Bell Telephone Co., 36 Ohio St., 296, it is held as follows: ‘‘By the provisions of chapter 4, title 2, of the revised statutes, each company operating a line or system of telephones in this state is required to re *494 ceive despatches from and for telegraph and other companies without discrimination.”
Then by analogy when Section 9191, General Code, was passed, making the act of which Sections 9170, 9180 and 9182 are a part, applicable to telephone companies as well as telegraph companies, the reference is manifestly limited to those telephone companies which are public utilities.
Section 614-2a, General Code, provides:
“The term ‘public utility’ as used in this act, shall mean and include every corporation, company, co-partnership, person or association, their lessees, trustees or receivers, defined in the next preceding section, except such public utilities as operate their utilities not for profit, and except such public utilities as are, or may hereafter be owned or operated by any municipality, and except such utilities as are defined as ‘railroads’ in sections 501 and 502 of the General Code * * * .”
As a public utility the defendant comes under the jurisdiction of the public utilities act, unless it is taken out under one of the three exceptions mentioned in Section 614-2a. Two of these exceptions have no application whatever to the defendant and may be discarded, as it is not a railroad or a municipally owned or operated utility. The next question, then, is whether or not it is a public utility operated “not for profit.” How may it be determined whether a corporation or association is one for profit or not for profit ? Does the filing of articles of incorporation, in which the declaration is made that it is not for profit, and on which the charter is issued, govern or determine this question? Is the issuance or non- *495 issuance of capital stock controlling, or is it whether a business is to be engaged in, and operated with consideration of the character of that business and the method of conducting it, that is the true test ?
We think the latter. Section 8667, General Code, provides:
“If a corporation be organized for profit, it must have a capital stock.”
It is held in Snyder v. Chamber of Commerce, 53 Ohio St., 1, that the declaration in the articles of incorporation, that it is formed not for profit, is not inconsistent with a provision for capital stock. In other words, it is the character of the business and the method of conducting that business that controls.
A corporation then, organized for profit, providing no capital stock whatsoever, under certain circumstances, may be in fact conducting a business for profit. A partnership association for the same reason, although having no capital stock, when engaging in a business, may and usually is engaging in that business for profit.
Here is a company calling itself a partnership association, but found to be a telephone company, as that term is used in the public utilities act, and, because it is a telephone company, it is under the same definition also a common carrier, with all the responsibilities and burdens which that term involves, engaging in the business of carrying messages, news and information, found to be a public utility, having the right to the use of the public streets by franchise grant, for the purpose, as announced in the *496 franchise-ordinance itself, of supplying the citizens of the village and the public with communication by telephone, and at the same time chartered and claiming to be a company not for profit.
In our opinion, this claim is no more than a legal conclusion, and totally at odds with what the company has done, and what under its own claims it contemplates doing. It says it does not contemplate connecting with other services for long distance or toll service “for the present.” Certainly not. The telephone plant was not erected or in operation. What it would do when the plant was erected and the business of the company in full operation is very easy to contemplate. As a telephone company, engaging in the business of transmitting telephonic messages for the benefit of the public and the citizens of the vicinity, it would have to furnish facilities for transmitting those messages to the outside world for the benefit of that public and those citizens, because that service is fundamentally the thing for which it holds, an excuse for existence.
We believe that taking into account the various representations made by this defendant in its statements and admissions, and applying statutory rules of law made applicable to that situation and condition, that this company from the very nature of its organization and existence is a public telephone company, a utility, and a common carrier, and, considering the nature and character of the business which it must engage in with the public as its patron, that such a business, no matter what the pretense may be, no matter what claims are advanced, in its *497 .very nature cannot be one operated in the true sense of the term “not for profit.”
It is probably for that reason that the legislature in treating telephone companies in Section 614-52, speaks of “no telephone company,” thus including all telephone companies and taking them out of the .exception provided in Section 614-2a, which excepts companies not for profit. That was the position taken in the case of Ashley Tri-County Mutual Telephone Co. v. New Ashley Telephone Co., 92 Ohio St., 336.
In so far as the provisions of the statute are concerned, therefore, the defendant is bound to comply with Section 614-52 before engaging in the public telephone business.
Defendant contends, and that contention was upheld by the court of appeals, that Section 614-52, General Code, is unconstitutional in infringing upon the guaranties given in Sections 1, 2 and 19, Article I of the Constitution of Ohio, and Section 1, Article XIV of the Constitution of the United States; that the rights of “acquiring, possessing and protecting property” are invaded; that the inhibitions, “No special privileges * * * shall ever be granted that may not be altered, revoked, or repealed” and “Private property shall ever be held inviolate,” have been transcended; and that “equal protection of the laws” has been denied.
The section at which these constitutional objections are directed was quoted above, and by the words telephone company used in this discussion is *498 meant one such as defined in Section 614-52 of the public utilities act.
If the claims made by the defendant in its brief should be found to be true, to-wit, that “it is not a public telephone company,” “we do not intend to serve the public,” “we think it does not mean a private business” (meaning that defendant is a private business), determination of the constitutional questions would not be important or even proper. The defendant would in no wise be affected by the public utilities act, because that is a regulatory act, regulating, as the name indicates, public utilities. Under such circumstances it is difficult to see how the constitutional question could be other than a moot one. In fact this would be true. The defendant is held by the admissions both in pleadings and brief, by what it has already done and contemplates doing, to have taken itself out of the domain of a mere “not for profit” business, and has qualified itself as a telephone company, engaged or about to engage in the telephone business, the transmission of telephonic messages, news, and information, a common carrier and a public utility. Has the legislature, then, in the enactment of this section as a part of the public utilities act, an act the entire purpose of which was intended to be regulatory, overstepped the bounds of regulation and invaded the sphere of monopolistic legislation? The general assembly says that when a public is being served by telephone, and the company so serving is furnishing adequate service, no other company shall exercise any permit, right, license or franchise, unless it first secures a certificate that the public convenience will be served, *499 the manifest intent being to insure to the public a higher or better character of service.
It is important to notice that the section does not prohibit another company from competing, but makes it a condition precedent to engaging in business in the way of competition for that company to first apply for and receive a certificate from the Public Utilities Commission. The commission in the act is provided with all the facilities to investigate and determine whether the public convenience will be served, and in so doing must determine first whether the serving company is furnishing adequate service, and next, irrespective of whether it is or is not so doing, find whether or not the public convenience will be better served by granting the certificate to a competing company.
It is thus clear that the commission has the authority to deny the right, and this authority is dependent upon and turns upon public convenience and public welfare; and this authority is not permitted to be exercised upon whim or caprice, but must be determined upon the facts of the case at a public hearing and with the right of review.
The aggrieved party is provided in the act with the machinery to appeal his cause to the court if the order of the Public Utilities Commission is either unlawful or unreasonable. There may be and probably is a divergence of opinion in respect to how the public may best be served. On the one hand it is asserted that competition between public utilities insures economy and better service. On the. other hand it is contended that in these modern times, when of necessity the public must be served through *500 the medium of communication by telephone, when the elements of cheapness and efficiency of service are alike involved, the majority of patrons, having in mind the inconvenience of more than one telephone, more than one directory to consult, and the like, believe that the elimination of dual service, with strict regulation, will more nearly meet the demands of the public, tend further toward the perfection of service, assuage public complaint, and respond to the public convenience and welfare.
However this may be, and whatever difference of opinion there may be, well founded or otherwise, the opinion of the court, individual or collective, would cast no light on the solution of the question. The question is purely a matter of exercise of the legislative function within the constitutional limitations, and the legislature has spoken, has adopted the latter plan, and the province of the court is limited to a determination of whether or not the action of the general assembly was within its constitutional power.
The courts have been resorted to frequently to pass upon and classify various actions of the general assembly, and determine whether those acts belong in the proper constitutional classification of regulation, or whether on the other hand they belong in that other class which is without and beyond the power of the general assembly, because of limitations specified in the constitutions.
The abstract rule is announced in Palmer & Crawford v. Tingle, 55 Ohio St., 423, where it is held:
“1. The inalienable right of enjoying liberty and acquiring property, guaranteed by the first section *501 of the bill of rights of the constitution, embraces the right to be free in the enjoyment of our faculties, subject only to such restraints as are necessary for the common welfare.
“2. Liberty to acquire property by contract, can be restrained by the general assembly only so far as such restraint is for the common welfare and equal protection and benefit of the people, and such restraining statute must be of such a character that a court may see that it is for such general welfare, protection and benefit * * * .”
And, again, it is held in State v. Powell, 58 Ohio St., 324:
“It is competent to the general assembly in the exercise of its legislative power, to adopt all such wholesome laws as may be necessary to promote the peace, health and well-being of society.”
See also State, ex rel. Monnett, Atty. Gen., v. Buckeye Pipe Line Co., 61 Ohio St., 520; Chicago & Erie Rd. Co. v. Keith, 67 Ohio St., 279, and Bloomfield v. State, 86 Ohio St., 253.
The civil service law as a regulatory measure has been held constitutional by this court, and “does not deny the equal protection of the laws nor abridge the privileges or immunities of citizens of the United States.” ( Green v. State Civil Service Commission, 90 Ohio St., 252.) Recognizing the same fundamental doctrine, this court, in County of Miami v. City of Dayton, 92 Ohio St., 215, upheld the constitutionality of the Conservancy Act. In Munn v. Illinois, 94 U. S., 113, 130, the United States supreme court,, reiterated a well founded *502 principle, to-wit: “When private property is devoted to a public use, it is subject to public regulation.”
In Allnutt v. Inglis, 12 East, 527, Lord Ellen-borough said:
“There is no doubt that the general principle is favored both in law and in justice, that every man may fix what price he pleases upon his own property or the use of it: but if, for a particular purpose, the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must as an equivalent perform the duty attached to it on reasonable terms.”
While the announcement of the principle is of ancient origin and came directly from the English law, it is yet the firmly recognized and followed doctrine. A long line of decisions may be found in the courts of last resort of many states and the United States. The most recent pronouncement along this line by the supreme court of the United States is the case of Lower Vein Coal Co. v. Industrial Board, 255 U. S., 144, decided February 28, 1921, where Section 18 of the Workmen’s Compensation Act of Indiana was held constitutional as against repugnancy claimed under the constitution of that state and the United States. Justice McKenna, delivering the opinion, says:
“The principle of law involved and the power of a state to distinguish and classify objects in its legislation have been too often declared, too abundantly and variously illustrated, to need repetition.”
*503 And speaking further of the discretionary power of the legislature, the right for the exercise of a judgment peculiarly and exclusively its own, says:
“There is something more in a compensation law than the element of hazard, — something that gives room for the power of classification which a legislature may exercise in its judgment of what is necessary for the public welfare, to which we have adverted, and which cannot be pronounced arbitrary because it may be disputed and ‘opposed by argu-‘ ment and opinion of serious strength.’ ”
In the case of Budd v. New York, 143 U. S., 517, it is held at page 544:
“The business of elevating grain is a business charged with a public interest, and those who carry it on occupy a relation to the community analogous to that of common carriers * * * and * * * must submit to be controlled by public legislation for the common good.”
The supreme court of Wisconsin has passed upon the constitutionality of the public utilities act of that state in State, ex rel. Kenosha Gas & Electric Co., v. Kenosha Electric Ry. Co., 145 Wis., 337, decided in 1911. The court held:
“While the legislature cannot'empower the railroad rate commission to exercise legislative power, it may clothe it with authority to administer a law requiring, as an incident to the administrative duty, the ascertainment of facts such as is required in passing upon an application for a certificate of convenience and necessity under the public utility law.”
*504 In the case of Idaho Power & Light Co. v. Blomquist, 26 Idaho, 222, 141 Pac. Rep., 1083, the supreme court of Idaho says:
“All property devoted to public use is held subject to the power of the state to regulate or control its use in order to secure the general safety, health and public welfare of the people, and when a corporation is clothed with rights, powers and franchises to serve the public, it becomes in law subject to governmental regulation and control. * * * Formerly competition was supposed to be the proper means of protecting the public and promoting the general welfare in respect to service of public utility corporations, but experience has demonstrated that public convenience and public needs do not require the construction and maintenance of numerous instrumentalities in the same locality, but, rather, the construction and maintenance only of those necessary to meet the public necessities, when such utilities are properly regulated by law.”
In the same case, in speaking of the public utility act of that state, the court held:
“Under the provisions of said act, unregulated competition is not needed to protect the public against unreasonable rates or unsatisfactory service; and there can now be no justification for unregulated competition or a duplication of utility plants under the pretense of preventing monopoly.”
The supreme court of Indiana, in a recent case, decided in 1918, .entitled Farmers’ & Merchants’ Cooperative Telephone Co. v. Boswell Telephone Co., 187 Ind., 371, held:
*505 “Section 10052t3 Burns 1914 (§97, Acts 1913, p. 167) prohibiting the licensing of public utilities for duplication of service, in the absence of a declaration of public necessity therefor, does not create a monopoly in the utility granted the first franchise, since the privilege is not exclusive, the state having power to grant another whenever public welfare would be served thereby.”
The court further held:
“This is not a deprivation of any inalienable right to engage in a lawful business or to hold property, and is not repugnant to the Bill of Rights * * * securing the rights of life, liberty and pursuit of happiness” and “Is not repugnant to the 14th amendment to the Federal Constitution.”
And it has come to be well settled, as civilization develops, and as new inventions and devices take their place in society, that wherever the public is concerned and the welfare of the people is in issue, technical constitutional invasions must give way.
Whether or not the principle of permitting or favoring a monopoly in the field in question is one sound in the political and economic view is one obviously for determination by the legislative branch of the government, and not by the judicial branch. In this state the legislature has made that determination in certain fields by various provisions in the public utilities act. The legislature having spoken, and having expressed, apparently at least, the economic and political view of the people of the state, it is not for the judicial branch to substitute its theory by holding such legislative expression re *506 pugnant to what the courts may conceive to be the spirit underlying the doctrine.
Finding as we do that no specific grant of any section of the Constitution of Ohio or of the Constitution of the United States has been invaded, the judgment of the court of appeals in this case is therefore reversed, and the cause is remanded to that court for further proceedings according to law.

Judgment reversed.

Robinson, Jones and Matthias, JJ., concur.
Johnson, J., concurs in propositions one and two of the syllabus.